THAMES, a.k.a. Thomas, et al., Appellants,

v.

ASIA'S JANITORIAL SERVICE, INC. et al., Appellees.

[Cite as *Thames v. Asia's Janitorial Serv., Inc.* (1992), 81 Ohio App.3d 579.]

Court of Appeals of Ohio,
Lucas County.

No. L-91-180.

Decided June 30, 1992.

580

*Alan J. Lehenbauer,* for appellants.

*David L. Honold, Joseph J. Pilkington* and *C. Allen McConnell,* for appellees.

---

ABOOD, Judge.

This is an appeal from a judgment of the Lucas County Court of Common Pleas which granted defendants-appellees' motion to dismiss, following the completion of plaintiffs-appellants' evidence in an action to quiet title tried by the court without a jury.

Appellants set forth two assignments of error:

"I. The trial court abused its discretion and committed prejudicial error in granting appellees' motion at the close of appellants' case, and said decision was against the manifest weight of the evidence.

"II. The trial court erred in granting appellees' motion as the words 'subject to' contained in a certificate of transfer conveyed an estate less than

fee simple to appellees and as such the transfer of the property to appellees continued to be subject to the land contract."

This appeal arises out of a dispute over the rights of the parties to three parcels of real property comprising approximately ten acres of land in Swanton Township, Lucas County, Ohio ("the property").

The undisputed chronology of facts which led to the filing of this action to quiet title are as follows.

(1) On December 16, 1963, Sim and Mary Harris, husband and wife, acquired the property.

(2) On February 14, 1969, Sim and Mary Harris entered into a land contract with Velma Thames, Mary's sister, and Booker Thames, Velma's husband, for the purchase of the property. The land contract was signed and acknowledged in the presence of only *one witness* and was *not recorded.*

(3) On August 4, 1970, Mary Harris died testate.

(4) On August 17, 1971, a certificate for transfer of Mary's interest in the property to her widowed husband, Sim, was received and recorded by the Lucas County Recorder. The certificate contained a legal description of Mary's interest in the property, followed by the words: *"SUBJECT TO LAND CONTRACT* to Booker and Velma Thomas."

(5) On March 6, 1978, a general warranty deed, "for valuable consideration paid," was properly executed in which Sim Harris, widowed and unmarried, granted title to the property to Booker Thames, widowed and unmarried. This deed was *not recorded.*

(6) On May 15, 1982, Sim Harris died.

(7) On November 5, 1985, a certificate of transfer of Sim Harris' entire interest in the property to Georgia Smallwood was received and recorded by the Lucas County Recorder. This certificate contained no reference to the land contract.

(8) On April 11, 1988, Georgia Smallwood conveyed the property, "for valuable consideration paid," by general warranty deed to Asia's Janitorial Services, Inc. This deed contained no reference to the land contract and was received and recorded by the Lucas County Recorder on May 16, 1988.

On June 21, 1990, appellants, the heirs of Velma and Booker Thames, a.k.a. Velma and Booker Thomas, filed their complaint in this action to quiet title brought against appellees, Asia's Janitorial Service, Inc. ("Asia's"), Asia J. Peterson and Georgia Smallwood. On August 10, 1990, appellees filed their answer and a motion to add Northwest Ohio Title Agency, Inc. ("Northwest") and Safeco Title Insurance Co. ("Safeco") as third-party defendants. On August 23, 1990, the trial court ordered that Northwest and Safeco be joined

as third-party defendants *instanter* and, on August 29, 1990, appellees filed their cross-claim for indemnity and contribution against them. On November 7, 1990, Northwest and Safeco filed their responses to the complaint and cross-claim.

On April 25, 1991, the case proceeded to trial to the court. Victor Crouch, appellants' expert, testified as follows:

"Q. * * * is Mr. Peterson * * * on notice as to an unrecorded land contract interest in your opinion?

"A. In my opinion, the reference to an unrecorded land contract in a certificate of transfer would put a person on notice for further inquiry. * * *

"Q. Now, if hypothetically he doesn't have that information after having ordered title papers to reflect that, is he on notice?

"A. No, not as far as the record goes."

Jessie Barksdale testified that she was Velma Thames's sister and Mary Harris' sister, and that in April 1987 she bought property adjacent to the property in dispute. It appears from her testimony, when viewed in conjunction with the title work that is contained in the record, that Velma and Booker lived at the property commencing when Sim Harris entered into a land contract to buy it in 1958 up until they vacated it in 1982. She testified further that she had known Peterson for over twenty years; that she told him that Velma and Booker's daughter, Marie Sims, had paid the property off; that when Peterson " * * * got interested (in the property), I told him, I said, A.J., I say, you better be careful, and he knowed that"; and that Peterson did not indicate to her at that time that he already owned the property. She also testified that "Georgia Smallwood supposed to be the so-called daughter of Sim Harris"; that she telephoned Smallwood in Pennsylvania when she discovered that the property was transferred to Smallwood after Booker died; and that, at that time, Smallwood " * * * thought my sister Velma and Booker Thames still owned the property." On cross-examination, she stated that she does not know whether Peterson had already purchased the property when she spoke with him.

Peterson testified that he is the president of Asia's, that he never met Smallwood, that he did not look at the property before he bought it, that he did not know before he bought it that it was vacant, that he had no discussions about the property with the Thameses or Barksdale prior to purchasing it, that he had not seen any document reciting that the property was subject to a land contract, and that he did not know the nature of the Thameses' relationship with the property. He testified further, however, as follows:

"Q   Now, did you know Marie Sims?

"A   Yes, I did.

"Q   And who is Marie Sims?

"A   That's Velma and Booker's daughter.

"Q   And didn't they once live on the property you purchased?

"A   Yes.

" * * *

"Q   And you visited her at the property?

" * * *

"A   . * * * I stopped in there periodically.  I used to go out hunting out in their vicinity.  I might stop in, have a coffee, something of this nature.

"Q   And who was Kevin Sims?

"A   Kevin Sims is Marie's son.

"Q   Is he any relationship to you?

"A   He's my son.

"Q   Your son.  Did he reside at that property also?

"A   Yes, he did.

"Q   Do you know what years he resided there?

"A   Well, I would say from '61 up until he moved out, and I don't know just when he moved out.

"Q   Do you know the approximate number of years?

"A   Probably 15, somewhere around in there.

"Q   So it was '61 through '76 approximately?

"A   I would say that's pretty much so, correct.

"Q   And Booker and Velma Thames resided there this whole time also?

"A   Yes.

" * * *

"Q   So you knew * * * at some point in time Booker and Velma had owned the property?

"A   *I never knew they owned the property.*  I was told, *I'd heard from discussions that they were buying the property.  I did not know how.*

"Q   *But you knew they had some ownership interest in the property potentially?*

"A   I was—*I heard this in conversation.*

"Q Okay. *That was prior to your purchasing the property that you had that awareness?*

"A *Yes.*" (Emphasis added.)

Selby Thames testified that he is the son of Velma and Booker Thames and the nephew of Sim and Mary Harris, that he resided at the property with his parents " * * * in '56 maybe '57", that his sister Marie made the final payment for his parents on the land contract, that he has known Peterson for twenty-five years, that Peterson " * * * was out there (at the property) quite a bit when he was courting my sister," that Peterson visited the property on a regular basis for approximately fifteen years, and that Velma and Booker lived there for approximately twenty-five years. He also testified that he never had any conversations with Peterson regarding the property and the ownership of it, but that he believes that Peterson had prior knowledge that his parents were purchasing the property " * * * because him and my father was real close and they did a lot of talking."

At the close of appellants' case-in-chief, appellees moved for a "judgment of acquittal." The trial court found that Peterson did not have constructive or actual knowledge of the " * * * previous interests in any land contract," that " * * * the plaintiff has not met the burden of proof with respect to this case * * * " and granted judgment in favor of appellees. Appellees then dismissed their cross-claim. On May 9, 1991, the trial court filed its judgment entry which granted what it referred to as appellees' "motion for direct [*sic*] verdict." It is from this judgment that appellants' bring this appeal.

## I. CONSTRUCTIVE NOTICE/ACTUAL KNOWLEDGE

In support of their first assignment of error, appellants argue that the evidence establishes that Peterson had constructive and/or actual knowledge " * * * of an outstanding interest at the time he purchased the property." Constructive notice, they reason, exists statutorily by virtue of the recital of the "subject to" language contained in the recorded deed of August 17, 1971. They also argue that the unrefuted evidence is that Smallwood knew of the Thameses' ownership prior to her transfer to Peterson and, therefore, the contract is invalid in equity between Smallwood and the other appellees even if Peterson is found to be a bona fide purchaser. Appellants do not contend that Smallwood is not subject to the rule set forth in R.C. 5301.25(A) because she is not a purchaser for value.

Appellees respond that when the document creating the interest is unrecorded, an actual knowledge standard must be applied; that even had the land contract been recorded, it would not constitute constructive notice because it was not signed and acknowledged in the presence of two witnesses; that the

evidence does not indicate actual knowledge by Peterson; and that a "should have known" or "could have known" test is not the appropriate standard in determining actual knowledge.

Appellants reply that Peterson's statement that he knew the Thameses were buying the property and had some potential ownership interest in the property " * * * is conclusive evidence of his knowledge of the outstanding interest in the property."

■ Civ.R. 41(B)(2) provides, in pertinent part, that:

"After the plaintiff, in an action tried by the court without a jury, has completed the presentation of evidence, the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. The court as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence."

In determining a motion made pursuant to Civ.R. 41(B)(2), the trial court is not required to review the evidence in the light most favorable to the nonmoving party, " * * * but may weigh the evidence to determine whether that party has made out his case by a preponderance of the evidence." *Jacobs v. Bd. of Cty. Commrs.* (1971), 27 Ohio App.2d 63, 56 O.O.2d 245, 272 N.E.2d 635, paragraph two of the syllabus; see, also, *Altimari v. Campbell* (1978), 56 Ohio App.2d 253, 256, 10 O.O.3d 268, 270, 382 N.E.2d 1187, 1190.

■ This court may not set aside the conclusions of the trial court in granting a motion made pursuant to Civ.R. 41(B)(2) merely because we may disagree with those conclusions. We may not reverse the trial court unless we find its conclusions to be erroneous as a matter of law or against the manifest weight of the evidence. *Altimari, supra*, at 256, 10 O.O.3d at 270, 382 N.E.2d at 1190; *Jacobs, supra*, 27 Ohio App.2d at 65, 56 O.O.2d at 246, 272 N.E.2d at 636.

The issue presented by appellants' first assignment of error is whether the trial court's conclusions as to constructive notice and actual knowledge are erroneous as a matter of law or against the manifest weight of the evidence.

R.C. 5301.25(A) provides as follows:

"All deeds, land contracts referred to in division (B)(2) of section 317.08 of the Revised Code, and instruments of writing properly executed for the conveyance or encumbrance of lands, tenements, or hereditaments, other than as provided in section 5301.23 of the Revised Code, shall be recorded in the office of the county recorder of the county in which the premises are situated, and until so recorded or filed for record, they are fraudulent, so far as relates

to a subsequent bona fide purchaser having, at the time of purchase, no knowledge of the existence of such former deed or land contract or instrument."

In *Tiller v. Hinton* (1985), 19 Ohio St.3d 66, 68, 19 OBR 63, 65, 482 N.E.2d 946, 949, the Supreme Court of Ohio stated that:

"Pursuant to this statutory provision, a bona fide purchaser for value is bound by an encumbrance upon land only if he has constructive or actual knowledge of the encumbrance."

■ In order to eliminate some possible confusion, we point out that the doctrine of "constructive knowledge" encompasses two distinct rules relative to bona-fide purchasers of real property, only one of which was being applied by the Supreme Court in *Tiller*. The first rule is the "common law" or "equitable" rule that a purchaser will be charged with knowledge of a previous encumbrance upon real property when he has knowledge of facts which would induce a prudent person to make an inquiry by which he would have or could have obtained knowledge of the prior encumbrance. Such a person is deemed to have actual knowledge as a result of having "constructive" or "implied" knowledge, is not a bona-fide purchaser and takes the property subject to the prior encumbrance. This equitable constructive-notice rule, however, has only been applied in Ohio *in the absence of a recording statute. Wayne Bldg. & Loan Co. v. Yarborough* (1967), 11 Ohio St.2d 195, 202, 40 O.O.2d 182, 186, 228 N.E.2d 841, 847; *Shaker Corlett Land Co. v. Cleveland* (1942), 139 Ohio St. 536, 541, 23 O.O. 27, 29, 41 N.E.2d 243, 246; *Hembree v. Mid–America Fed. S. & L. Assn.* (1989), 64 Ohio App.3d 144, 155–156, 580 N.E.2d 1103, 1110–1111.

■ The second rule is that the proper recording of those instruments referenced in R.C. 5301.25(A) serves as "constructive" notice of that interest or encumbrance to all who claim through or under the grantor by whom such deed was executed. Such notice, in this statutory sense, is "constructive" because the subsequent purchaser is deemed to have notice *of the record* whether he reviewed it or not. See *Morris v. Daniels* (1880), 35 Ohio St. 406, 416; *Blake v. Graham* (1856), 6 Ohio St. 580, 583–584.

■ The rule in Ohio is that where the instrument of conveyance is one that is subject to R.C. 5301.25(A) and is not properly recorded, " * * * an actual knowledge standard must be applied." *Emrick v. Multicon Builders, Inc.* (1991), 57 Ohio St.3d 107, 109, 566 N.E.2d 1189, 1193; *Varwig v. Cleveland, Cincinnati, Chicago & St. Louis RR. Co.* (1896), 54 Ohio St. 455, 468, 44 N.E. 92, 94. Actual knowledge may be inferred, but not implied. *Id.*, 57 Ohio St.3d at 110, 111, 566 N.E.2d at 1193, 1194. The reference, therefore,

to "constructive knowledge" in *Tiller, supra,* is to the rule that a *record* serves as constructive knowledge, not the equitable rule that actual knowledge will be implied from knowledge of facts outside the title record which induces inquiry.

As to what constitutes the record for purposes of constructive notice pursuant to R.C. 5301.25(A), three rules that are pertinent to the issues herein have been developed by our courts: (1) a subsequent purchaser of land is charged with constructive knowledge of the *contents* of an instrument recorded under R.C. 5301.25(A) " * * * only as, in the process of tracing, link by link, his *chain of title* on the record, necessarily pass under his inspection." (Emphasis added.) *Blake, supra,* at 584; see, also, *Emrick, supra,* 57 Ohio St.3d at 109, 566 N.E.2d at 1192; *Tiller, supra,* 19 Ohio St.3d at 68, 19 OBR at 65, 482 N.E.2d at 949; *Morris, supra,* at 416–417. (2) The "contents" of such a recorded instrument include recitals or disclosures therein as to outstanding rights in the property even though not created by that instrument. *Blake, supra,* at 583–584; see, generally, 80 Ohio Jurisprudence 3d (1988) 608–609, Records and Recording, Section 65. (3) Instruments that are not entitled to be recorded or that are defectively executed, such as has not been acknowledged by two witnesses as prescribed in R.C. 5301.01, do not serve as constructive notice to a subsequent purchaser even though recorded. *Bank v. Denison* (1956), 165 Ohio St. 89, 59 O.O. 96, 133 N.E.2d 329, paragraph two of the syllabus; *State ex rel. Puthoff v. Cullen* (1966), 5 Ohio App.2d 13, 15–16, 34 O.O.2d 61, 62–63, 213 N.E.2d 201, 202–203; see, also, this court's decision in *Grant v. Hickok Oil Co.* (1948), 84 Ohio App. 509, 514, 40 O.O. 9, 12, 87 N.E.2d 708, 711 (recording of land contract is not constructive notice under former G.C. 8543, which did not provide for the recording of land contracts).

As to appellees' contention that the land contract was defective, a purchaser who takes property with actual knowledge of the existence of a conveying instrument and that such instrument is defective takes subject to the same equities to which his grantor is subject. *Wheeler v. Nims* (1921), 23 Ohio N.P. (N.S.) 527.

As to appellants' reliance on *Lessee of Cunningham v. Buckingham* (1824), 1 Ohio 264, the holding in that case was premised on an "implied" notice standard. Although not specifically overruled by *Emrick, supra,* we doubt that *Lessee of Cunningham* survives *Emrick.* While neither party contends that Swanton is overpopulated, there is a marked difference between it and the town of Newark in 1810 where, the trial court noted, " * * * there were not at that time more than a dozen families residing in the town." *Id.* at 265.

■■■■■ Upon consideration of the entire record of proceedings before the trial court, and the law as set forth above, this court finds: (1) a purchaser of land cannot be charged with constructive knowledge of a prior instrument by which that land was transferred, in the absence of a record; (2) a recorded deed in the chain of title which states that the land being transferred is subject to a land contract to certain named persons, which land contract is unrecorded, constitutes constructive notice to a subsequent purchaser of the existence of the land contract; (3) where that land contract, however, is defectively executed in contravention of R.C. 5301.01, the reference to it in another recorded deed does not serve as constructive notice to a subsequent purchaser; (4) while it is undisputed that the August 17, 1971 deed referencing the land contract to Booker and Velma was recorded in appellees' chain of title, the land contract to which it referred was defectively executed and, therefore, the reference in the deed to the land contract does not constitute constructive notice to appellees of the existence of the land contract; (5) in the absence of a recording, a land contract is fraudulent as it relates to a subsequent bona fide purchaser without actual knowledge of the existence of the land contract; and (6) the trial court's conclusion that appellants have failed to prove actual knowledge on the part of appellees is not erroneous as a matter of law or against the manifest weight of the evidence.

Accordingly, appellants' first assignment of error is not well taken.

## II.  QUALIFIED ESTATE/"EXCEPTION" ISSUE

■■■ In support of their second assignment of error, appellants argue that the words "subject to" in the August 17, 1971 deed qualify the estate granted, constitute an "exception" from the grant and, therefore, conveyed less than a fee simple title;  they rely exclusively upon the statement in 23 American Jurisprudence (1983) 271, Deeds, Section 293, that "[t]he words 'subject to' in a deed conveying an interest in real property are words of qualification of the estate granted," and on *Shewell v. Goshen Union Local School Dist. Bd. of Edn.* (1950), 88 Ohio App. 1, 43 O.O. 375, 96 N.E.2d 323.

The footnote to the above-quoted sentence in 23 American Jurisprudence, *supra,* references two cases, a review of which indicates that the words "subject to" in a deed may amount to a qualification of the estate without creating an "exception" or conveying less than a fee simple title.  In *Harley v. Magnolia Petroleum* (1941), 378 Ill. 19, 37 N.E.2d 760, the court dealt with an action to reform a deed on the basis that the grantees were mistaken as to the terms of the lease which the conveyance was "subject to."  In holding that the evidence did not show such mutual mistake as would justify reformation, the court noted that:

"These grantees knew that they were taking their deeds 'subject to' the provisions of the lease as recited in the deeds which were prepared and presented by them. The words 'subject to' are words of qualification of the estate granted." *Id.* at 31, 37 N.E.2d at 766.

In *McRae v. Pope* (1942), 311 Mass. 500, 42 N.E.2d 261, that court was confronted with an action to reform a warranty deed to reflect that the grantee assumed the mortgage which the conveyance was "subject to." The court was of the opinion that the rights of the grantors do not depend upon a reformation of the deed, reasoning as follows:

"A deed in this form has the force and effect of a deed in fee simple * * *[.] [T]he language used * * * was to be taken in a limited sense, * * * that the statement in the deed following the description of the land, that the 'above premises are conveyed subject to' the mortgage, qualifies the estate granted, and that it is to that estate, so qualified, that the warranties apply." *Id.* at 504, 42 N.E.2d at 264.

As to appellants' reliance on *Shewell, supra,* at 2, 43 O.O. at 375, 96 N.E.2d at 324, that court held that an exception was created in a deed by the language " ' * * * except the right owned by the school district * * * to about one fourth of an acre of land now used as a school house lot.' " In so holding, the court found that the language employed did more than merely reserve the right to use the land; it excepted one fourth of an acre of land itself from the grant. The basis for this finding was that the right owned by the school district was a good legal title in fee simple to the one fourth acre of land. The court's holding is in accord with the general concept that "[a]n 'exception' is separating a part of that embraced in the description and already existing in specie * * *." 35 Ohio Jurisprudence 3d (1982) 323, Deeds, Section 92.

In accordance with the foregoing, this court finds that the deed transferring Mary Harris' interest in the property to Sim did not create an exception and that, although the grant to Sim was qualified, he received a fee simple title to the property.

Accordingly, appellants' second assignment of error is not well taken.

Upon consideration whereof, this court finds that substantial justice has been done the party complaining, and the judgment of the Lucas County Court of Common Pleas is affirmed. This court finds further that there are good grounds for this appeal and costs only are assessed against appellants.

*Judgment affirmed.*

HANDWORK, P.J., and MELVIN L. RESNICK, J., concur.